**ZIMMERMAN REED LLP**
Ryan J. Ellersick (SBN 357560)
Caleb Marker (SBN 269721)
Jessica M. Liu (SBN 358713)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel (877) 500-8780
Fax (877) 500-8781
ryan.ellersick@zimmreed.com
caleb.marker@zimmreed.com
jessica.liu@zimmreed.com

*Attorney for Plaintiffs and the Putative Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.C. and Y.H., individually, and on behalf of those similarly situated, | Case No. |
| Plaintiffs, | **COMPLAINT - CLASS ACTION** |
| v. | |
| MIDI HEALTH, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiffs N.C. and Y.H. ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys of record, assert the following against Midi Health, Inc. ("Midi" or "Defendant").

## **INTRODUCTION**

1.      This class action arises out of Midi's unlawful use of third-party tracking technologies (the "Tracking Tools") to surreptitiously intercept and disclose its patients' private and protected communications, including communications concerning highly sensitive personal health information, to third parties, without patients' knowledge or consent. By purposely embedding and deploying the Tracking Tools on Midi's website, https://www.joinmidi.com (the "Website") Midi engages in the unauthorized disclosure of its patients' highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Personal Information") to third parties,

including, but not limited to, Meta Platforms, Inc. d/b/a/ Meta, TikTok, Google, Pinterest, Microsoft, and LinkedIn, all in violation of California law.

2.    Midi is a telehealth company that specializes in treatment for women's health issues. According to its website, "Midi Health is the fastest growing virtual care clinic focused on women navigating midlife hormonal change and beyond. With treatment protocols created by world-class medical experts in perimenopause and menopause, delivered by clinicians trained in women's midlife health, Midi Health provides patients with personalized care plans that include hormonal and non-hormonal medications, supplements, lifestyle coaching and more."

3.    In connection with seeking health services from Midi, Midi's Website allows patients and prospective patients to research topics related to women's health treatment options, symptoms, diagnoses, medications, and doctors. The Website also allows patients to take an initial health assessment and ultimately schedule appointments with healthcare providers. Unbeknownst to its patients and prospective patients, these communications with the Midi Website are intercepted and disclosed to third parties through Midi's use of the Tracking Tools.

4.    One of the Tracking Tools Midi deployed on its website is the Meta Pixel ("Pixel").[1] The Meta Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to Meta. This includes tracking and logging pages and subpages the website user visits during a website session that reveal patient status and other personal identifying and protected health information, which is not anonymized. Indeed, Pixel is routinely used to target specific individuals by utilizing the data gathered through the Meta Pixel to build profiles for the purpose of future targeting and marketing. Here, the information transmitted to third-party Meta without Plaintiffs' prior consent included private health information,[2] which is some of the most personal and sensitive data a person has.

---

[1] Meta also provides other tracking technologies that give the same or similar tracking functionalities as Pixel, including, but not limited to, Conversions API, SDKs, and Audiences.

[2] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related

5.      Additionally, when a patient communicates with Midi's Website where the Meta Pixel is present, the Pixel source code causes the exact content of the patients' communications with the Website to be re-directed to Meta in a way that identifies the person as a patient. Here, for example, Plaintiffs used the Website to communicate about their health symptoms and conditions. Unbeknownst to Plaintiffs, when they communicated about their personal health information, the Pixel secretly intercepted, recorded, and transmitted those private communications to Meta along with unique identifiers Meta could use to identify Plaintiffs. In short, Midi used the Pixel to intercept its users' communications and have those communications associated with Facebook and Instagram user profiles for purposes of future ad targeting and marketing.

6.      As a result of Defendant's use of the Pixel, Plaintiffs' and Class Members' Personal Information, including, but not limited to, computer IP addresses; patient status; health conditions; health symptoms; treatments; health assessments; and unique identifiers used to link the web communications to Plaintiffs and the Classes, was compromised and disclosed to third parties without express prior authorization or consent.

7.      Such private information would allow Meta to know that a specific patient was seeking confidential health care from Midi or exploring treatment for specific conditions related to women's health.

8.      In addition to its use of the Meta Pixel, Midi deployed tracking technologies (collectively, the "Tracking Tools") that transmitted users' Personal Information to additional unauthorized third parties for marketing and advertising purposes, including TikTok, Google, Pinterest, Microsoft, and LinkedIn, among others.

9.      Plaintiffs and the Class Members did not provide express prior consent or authorization to allow Defendant to disclose their Personal Information to anyone other than those reasonably believed to be part of Midi, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' Personal Information to multiple third-party technology companies for ad retargeting and otherwise monetizing Plaintiffs' data.

to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

10.    As a direct and proximate result of Defendant's unauthorized exposure of Plaintiffs' and the Class Members' Personal Information, Plaintiffs and the Class Members have suffered injury, including an invasion of privacy; statutory damages; and the continued and ongoing risk to their Personal Information being exposed to unauthorized third parties.

11.    Accordingly, Plaintiffs bring this action individually, and on behalf of Classes of similarly situated individuals, to recover for harms suffered and asserts the following claims: (I) Violation of the California Invasion of Privacy Act, Cal. Penal Code, § 630 et seq.; (II) Invasion of Privacy in Violation of Article I, Section 1 of the California Constitution; (III) Common Law Invasion of Privacy – Intrusion Upon Seclusion; and (IV) Breach of Confidence.

**PARTIES**

15.    **Plaintiff N.C.** is natural person who resides and intends to remain in California. At all relevant times, N.C. was a citizen of California. Within the last year, N.C. visited Midi's Website from California using her cell phone to research conditions, symptoms, and treatments related to women's health issues. N.C. also used the Website to take Midi's initial health assessment, but did not complete the health assessment given the sensitive information requested. At all relevant times, N.C. maintained accounts and stayed logged in to Facebook, Instagram, Google, Pinterest, and LinkedIn. After visiting Midi's Website and communicating about private health treatment for herself, N.C. received numerous ads on Facebook, Instagram, and Google from Midi and other companies focusing on women's health.

16.    **Plaintiff Y.H.** is a natural person who resides and intends to remain in California. At all relevant times, Y.H. was a citizen of California. Within the last year, Y.H. visited Midi's Website from California using her cell phone to research conditions, symptoms, and treatments related to women's health issues. Y.H. also used the Website to take Midi's initial health assessment. At all relevant times, Y.H. maintained accounts and stayed logged in to Facebook and Instagram. After visiting Midi's Website and communicating about private health treatment for herself, Y.H. received ads related to women's health issues.

17.    Plaintiffs did not provide express prior consent for the disclosure of their Personal Information to Meta, TikTok, Google, and other third parties.

18.     Plaintiffs reasonably expected that their online communications with Defendant were between them and Defendant and that such communications would not be shared with third parties without their express prior consent.

19.     **Defendant Midi Health, Inc.,** is a Delaware corporation with its principal place of business in Los Altos Hills, California.  According to its corporate certificate with the California Secretary of State, Midi also maintains a primary mailing address in San Francisco, California.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

21.     This Court has personal over Defendant because Midi purposely availed itself of the benefits of the forum and because a substantial portion of the events giving rise to this complaint occurred in this District.

22.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) – (2) because Defendant's principal place of business is in this District and because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Federal Regulators Have Warned Healthcare Providers About the Use of Tracking Technologies**

23.     The surreptitious collection and disclosure of personal health information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the U.S. Department of Health and Human Services ("HHS") have recently reiterated the necessity for data security and privacy concerning health information.

24.     For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health. Indeed, [recent FTC enforcement

5

actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[3]

25.    The FTC is unequivocal in informing companies that provide healthcare services that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.** In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out. [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[4]

26.    In December 2022, HHS similarly warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[5]  The OCR's guidance also made clear that, "disclosures of PHI to tracking technology vendors for marketing

---

[3] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), archived at Wayback Machine, https://web.archive.org/web/20250210181100/https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (Feb. 10, 2025).

[4] *Id.* (emphasis added).

[5] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. The original guidance was issued in December 2022 and was recently updated in March 2024.

purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[6]

27.     In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[7]  The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[8] According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[9]

28.     In February 2024, the FTC took enforcement action against telehealth provider Cerebral Inc., for, among other things, providing "sensitive information of nearly 3.2 million consumers to third parties such as LinkedIn, Snapchat and TikTok by using or integrating tracking tools on its website or apps."[10]

---

[6] *Id.*

[7] See Leslie Fair, *FTC-HHS joint letter gets to the heart of the risks tracking technologies pose to personal health information*, FTC Business Blog (July 20, 2023), archived at Wayback Machine, https://web.archive.org/web/20250214142925/https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information (Feb. 14, 2025).

[8]     https://web.archive.org/web/20250201054357/https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[9] *Id.*

[10] *Proposed FTC Order will Prohibit Telehealth Firm Cerebral from Using or Disclosing Sensitive Data for Advertising Purposes, and Require it to Pay $7 Million*, https://www.ftc.gov/news-events/news/press-releases/2024/04/proposed-ftc-order-will-prohibit-telehealth-firm-cerebral-using-or-disclosing-sensitive-data (last visited March 25, 2025)

29.    Despite these clear warnings from federal regulators and prior enforcement actions, Midi deployed Tracking Tools on its Website to secretly track its patients' communications regarding sensitive health issues and disclose those communications to third parties without express prior consent.

**B.    Midi's Misleading Website Disclosures**

30.    Midi does not obtain its users' express prior consent to deploy the Tracking Tools and intercept users' health-related communications.

31.    When users first access the Midi Website, there is no disclosure concerning Midi's use of the Tracking Tools, nor the categories of substantive information transmitted to third parties via the Tracking Tools.

32.    Only after users decide to book an appointment and select a "care concern" for the visit— menopause, perimenopause, or weight—are they prompted to provide biographical information and create an account, including by clicking a box containing a hyperlink to Midi's Privacy Policy.

33.    Midi's Privacy Policy, however, provides misleading and inadequate disclosures concerning Midi's collection and dissemination of protected health information. With respect to "protected health information," for example, the Privacy Policy refers users to the "Medical Groups' Notice of Privacy Practices," but does not provide a link or otherwise direct users to the actual Notice of Privacy Practices. Instead, the Privacy Policy claims, "If your Personal Data is protected health information, we treat the protected health information in accordance with HIPAA and the Notice of Privacy Practices. To the extent this Privacy Policy conflicts with our HIPAA obligations or the Notice of Privacy Practices, we comply with HIPAA obligations or the Notice of Privacy Practices." As described in this Complaint, however, Midi discloses its users' individually identifiable health information to third parties for marketing purposes in violation of HIPAA.

34.    Further, Midi's Privacy Policy does not disclose that the Tracking Tools intercept users' substantive communications with the Midi Website—including, for example, that a user is attempting to book an appointment related to "menopause"—along with unique identifiers used by third-party tech companies to link the website communications to identified users for purposes of ad retargeting.

**C.    The Meta Pixel**

35.    Through its Website, Midi connects Plaintiffs and the Class Members to Defendant's digital health care platform with a core goal of increasing profitability.

36.    In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely deployed the Meta Pixel on its Website. By doing so, Defendant surreptitiously shared its patients' and prospective patients' identities and online activity, including private communications related to conditions, symptoms, treatments, and medications, with Meta.

37.    Meta's primary business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in annual revenue comes from advertising.

38.    Over the last decade, Facebook, now Meta, has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

39.    Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

40.    One of Meta's most powerful advertising tools is the "Meta Pixel" (formerly the "Facebook Pixel"), which it first launched in 2015.

41.    Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences[,] and get rich insights about how people use your website. We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.

> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel. You only need to place a single pixel across your entire website to

> report and optimize for conversions. Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.

9

> [Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (*e.g.*, Purchase) to your Facebook pixel base code on appropriate pages (*e.g.*, purchase confirmation page).[11]

42.    The Pixel is a piece of code that Meta makes available to website developers for free. In exchange, website developers must agree to Meta's Business Tool Terms.[12]

43.    The Business Tool Terms note that the Pixel will capture two types of information: "Contact Information" which "personally identifies individuals," and "Event Data" which contains additional information about people and their use of a developer's website.[13]

44.    The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[14]

45.    However, even with all of these protocols in place, Meta prohibits the disclosure of Business Tool Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[15]

46.    After agreeing to the Business Tools Terms, website developers can choose to install and use Pixel on their websites to track and measure certain actions, such as a website visitor's text searches

---

[11] Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited March 25, 2025).

[12] Meta Business Tool Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data.") (last visited March 25, 2025).

[13] *Id.* at Section 1(a)(i)-(ii)

[14] *Id.* at Section 3(c)(i)

[15] *Id.* at Section 1(h).

10

and page views, including the detailed URLs triggered by page views. When a website visitor takes an action on the website, Pixel is triggered and sends data about that "Event" to Meta contemporaneously and in real-time. By default, the Pixel tracks URLs visited, domains visited, and the devices visitors use. Website developers can also customize the Pixel to track additional activities. All of this happens without the user's knowledge or consent.

47.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

48.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

49.     Ultimately, a browsing session online may consist of thousands of web communications. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- An **HTTP Request** is an electronic communication a website visitor sends from his device's browser to the website's server. There are two types of HTTP Requests: (1) GET Requests, which are one of the most common types of HTTP Requests—in addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies; and (2) POST Requests which can send a large amount of data outside of the URL. In this case, a patient's HTTP Request would be asking Defendant's Website to get certain information, such as information about specific health conditions. So that servers can better understand what information users are requesting, HTTP Requests also use URLs that contain parameters, which use variables and assigned values in the URL to pass additional information through the HTTP Request.

- **Cookies** are a text file that website operators and others use to store information on the website visitor's device; these can later be communicated to a server or servers. Cookies are sent with HTTP Requests from website visitor's devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Third-party cookies are created by a website with a domain name other than the one the user is visiting, in this case Meta. There are also "first-party cookies," like the fbp cookie, which is created by the website the user is visiting, in this case Defendant. Meta uses both first- and third-party cookies in Pixel to link Facebook IDs and Facebook profiles, and Defendant sends these identifiers to Meta.

- An **HTTP Response** is a response to an HTTP Request. It is an electronic communication that is sent as a reply to the website visitor's device's web browser from the host server. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data. Basically, the HTTP Response is when the website sends the requested information (*see* the HTTP Request); this is sometimes called the "Markup."

50.    A user's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "perimenopause"). The HTTP Response then renders or loads the requested information in the form of Markup (i.e., the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website).

51.    Every website, including Defendant's, is composed of Markup and "Source Code." Source code is a set of instructions that commands the website visitor's browser to take certain actions when the web page loads or when a specified event triggers the code.

52.    Source code may also command a web browser to transmit data to third parties in the form of an HTTP Request. Such data transmissions allow a website to export data about users and their actions to third parties. Third parties receiving this data are typically configured to track user data and communications for marketing purposes.

CLASS ACTION COMPLAINT

53.     Transmission of such data can be done quietly in the background without notifying the web browser's user. The pixels are invisible to website users and thus, without any knowledge, authorization, or action by the user, the website developer (or website commander) can use its source code to contemporaneously and invisibly re-direct the user's PII and other non-public health information to third parties. Through Pixel, Defendant uses source code that can accomplish just that.

54.     Pixel "tracks the people and the types of actions they take."[16] According to Meta, Pixel is a piece of code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[17] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Midi.

55.     Through this online tracking technology, Meta intercepts each page a user visits, what buttons they click, as well as the specific information the user inputs into the Website and other searches conducted, all in real-time and contemporaneous with the user's actions on the Website. Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address and unique identifying cookies. Meta stores this data on its own servers and independently uses the data for its own financial gain.

56.     Importantly, this data is often associated with the individual user's Facebook or Instagram account. For example, if the user is logged into their Facebook or Instagram account when the user visits Defendant's website, Meta receives third-party cookies allowing Meta to link the data collected by Pixel to the specific user. In other words, a user's personal and private information sent by the Meta Pixel to Meta is transmitted alongside that user's personal identifiers, including IP address and cookie values, which can be linked to the user's unique Facebook or Instagram account.

57.     Meta accomplishes this by placing cookies in the web browsers of users logged into their services, which aids Meta in identifying users.

---

[16] *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting (last visited March 25, 2025).

[17] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 25, 2025).

58.     One such example is the "c_user" cookie, which is a type of third-party cookie assigned to each person who has a Facebook or Instagram account. The "c_user" cookie contains a numerical value known as the Facebook ID ("FID") that uniquely identifies a Facebook or Instagram user. It is composed of a unique and persistent set of numbers. A user's FID is linked to their Facebook or Instagram profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook or Instagram account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly, and easily, locate, access, and view the user's corresponding Facebook or Instagram profile. Thus, when a Facebook or Instagram user visits Defendant's Website while logged in to their account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

59.     Even if a user does not have a Facebook or Instagram account or is not logged in to Facebook or Instagram when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook or Instagram account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

60.     Meta's Business Tools Terms make clear that Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[18]

61.     After Meta is finished processing users' intercepted information, it makes the relevant analytics available to Midi through Meta's Event Manager tool.

---

[18] Meta Business Tool Terms, Section 2(a)(i)(1),
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0S
Tn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr (last visited March 25, 2025).

62.     Using the Events Manager, Midi can and is intended to review a summary of users' activity, including the pages, parameters and URLs sent through the Pixel,[19] as well as any included metadata.[20]

63.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta.  Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

64.     Judge William H. Orrick on the U.S. District Court for the Northern District of California summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted).[21]

---

[19]     *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . .") (last visited March 25, 2025).

[20] A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142 (last visited March 25, 2025).

[21] In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022

65.     Pixel also allows a company, like Defendant, to impact the delivery of ads, measure cross-device conversions, create custom audiences, and save money on advertising and marketing costs.[22]

66.     When visitors to Midi's Website, like Plaintiff and the Class Members, communicated with Defendant or inquired about personal health-related topics, that information was transmitted to and intercepted by Meta in real-time.

67.     The Personal Information intercepted, recorded, and transmitted to Meta includes, but is not limited to, patient status; health symptoms; health conditions; treatments; and medications, all of which reveal the substance of user communications with Defendant's Website.  During that same transmission, Defendant would also provide Meta with the patient's Facebook ID number, other persistent cookies, device ID, computer IP addresses, or other PII. This information makes it easy to link private communications with Defendant via the Website to a specific and identifiable Facebook or Instagram user.[23]

68.     Once Meta has that data, it can process it, analyze it, and assimilate it into databases like Core Audiences or Custom Audiences for advertising purposes. If the Website visitor is also a Facebook or Instagram user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies the user's name and Facebook or Instagram profile. In sum, the Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Website visitors communicated, viewed, or otherwise interacted with on Defendant's Website.

---

WL 17869218, at *2. *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

[22] *Meta Pixel,* Facebook, https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2 (last visited March 25, 2025).

[23] On information and belief, Midi also deployed another tracking tool from Meta called Conversions API, which Meta recommends that web developers deploy in tandem to maximize data collection. Best Practices – Conversions API, https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices ("We recommend that you use the Conversions API in addition to the Meta Pixel, and that you share the same events using both tools."). Conversions API functions like the Meta Pixel and other Tracking Tools, but through server-to-server communications.

16

**D.    Midi's Use of other Tracking Tools**

69.    In addition to its deployment of the Meta Pixel, Midi deploys Tracking Tools from multiple other third-party technology companies, including, but not limited to, TikTok, Google, Pinterest, Microsoft, and LinkedIn.  These Tracking Tools function in a substantially similar way as the Meta Pixel by intercepting the substance of a user's communications with the Midi Website in real-time and transmitting those communications to third parties along with unique identifiers used to link the communications to a user's account.

### *i.    The TikTok Pixel*

70.    The TikTok Pixel is a piece of code that companies can embed in their websites to transmit information to TikTok about user activities on the website.  Once the TikTok Pixel is installed on a website, the Pixel secretly operates in the background, invisible to visitors to the website, while it intercepts and records the user's communications with the website.

71.    By default, the TikTok Pixel collects the following information: the timing of when actions on the website take place (like when a page is viewed); the user's IP address; the device make, model, operating system, and browser information for the user; third-party cookies to match the user's website communications to an identified person on TikTok; pages viewed on the website; buttons clicked on the website; and content typed into "search" bars.  Beyond these standard collection efforts, a website owner can also customize the TikTok Pixel to collect additional information about a website visitor's activities and transmit that information to TikTok.

72.    TikTok uses cookies and other unique identifiers intercepted by the TikTok Pixel to match a website visitor's communications and activities with a particular individual.

73.    When an individual with a TikTok account visits a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits them to TikTok along with unique first and third-party cookies. TikTok can then "[m]atch [the] website visitors with people on TikTok."[24]

---

[24] *Using Cookies with TikTok Pixel*,  https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=2 (last visited March 25, 2025).

74.     Even when an individual does not have a TikTok account, when they visit a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits the information to TikTok.[25]  On information and belief, TikTok can then match the communications to a particular individual through a process called "fingerprinting."[26]

75.     TikTok uses the information it collects through the TikTok Pixel to provide advertisers—like Midi —with custom or lookalike audiences for purposes of targeted advertising campaigns.  TikTok can also sell the personal data it collects to data brokers and other third parties. Indeed, a recent analysis found that TikTok shared its users' data more than any other social media app, and it was unclear where the data went.[27]

76.     Deploying the TikTok Pixel without user consent is particularly concerning given the unique privacy and national security threats posed by TikTok's collection of data from American consumers. In April 2024, the United States passed the Protecting Americans from Foreign Adversary Controlled Applications Act, which requires TikTok to be divested from its Chinese ownership or face shutdown in the U.S. In upholding the constitutionality of that law, the U.S. Supreme Court recently observed that the law's "prohibitions and divestiture requirement are designed to prevent China—a designated foreign adversary—from leveraging its control over ByteDance Ltd. to capture the personal data of U. S. TikTok users," which qualified as "an important Government interest." *TikTok Inc. v. Garland*, No. 24-656, 2025 WL 222571, at *6 (U.S. Jan. 17, 2025).

77.     Midi's Privacy Policy says nothing about its deployment of the TikTok Pixel, nor the type of substantive health information intercepted by TikTok on the Midi Website.

### iii.  Google Tracking Code

---

[25] Thomas Germaine, *How TikTok Tracks You Across the Web, Even If You Don't Use the App*, https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/ (last visited March 25, 2025).

[26] Matt Burgess, *The Quiet Way Advertisers Are Tracking Your Browsing*, https://www.wired.com/story/browser-fingerprinting-tracking-explained/ (last visited March 25, 2025).

[27] Tom Huddleston, Jr., *TikTok shares your data more than any other social media app — and it's unclear where it goes, study says*, https://www.cnbc.com/2022/02/08/tiktok-shares-your-data-more-than-any-other-social-media-app-study.html (last visited March 25, 2025).

78.     Google makes available to web developers a variety of tracking code, including Google Analytics and Google DoubleClick.

79.     The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site.  In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

80.     Like with the other Tracking Tools, the user's communications to the website are transmitted to Google in real-time together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services. Google then profits off the intercepted information by selling targeted advertising.

**E.     Midi Knowingly and Purposely Aids the Third-Party Interception of Communications on its Website by Deploying the Tracking Tools**

81.     As an example of how the Tracking Tools operate on Midi's Website, consider a visitor who uses Defendant's Website to research prescription medication to treat sexual health.  When doing so, the visitor's browser sends a GET Request to Defendant's server, requesting the server to load the webpage displayed on the left side of Figure 1 below. At the same time, the Meta Pixel causes the visitor's browser to secretly and contemporaneously duplicate the visitor's communication with Midi's Website, including the "pageview," and transmit the private communication to Meta along with unique identifiers such as the "c_user" cookie used to link the communication to a specific Facebook or Instagram:

19



*Figure 1: Depiction of DHEA/Estradiol Cream webpage*

82.    As another example, if that same patient attempted to book an appointment with a Midi physician, the patient would first be directed to a page where she could select a "care concern for [her] visit." Unbeknownst to the patient, her selection of the "care concern" and attempt to book an appointment would be intercepted by TikTok, as reflected in Figures 2 and 3 below:



*Figure 2: Selection of "Care Concern" for Appointment*

1
2
3
4
5
6
7
8
9
10



11

*Figure 3: Selection of "Perimenopause"*

12

13    83.    Midi even deployed the TikTok Pixel on its account creation and patient login pages,

14    revealing to TikTok that an identified individual is a patient seeking healthcare from Midi, as reflected

15    in Figures 4 and 5 below:

16
17
18
19
20
21
22
23
24
25
26
27
28



*Figure 4: Account Creation webpage*



*Figure 5: Patient Login page*

84.    Midi's deployment of the Google tracking code works in much the same way.  If a patient booking an appointment selected "weight," she would be directed to the following webpage, but her activities would likewise be transmitted in real-time to Google (via the Google DoubleClick tracking code) along with unique identifiers used to retarget her with ads, as reflected in Figure 6:



*Figure 6: Selection of "Weight" for Appointment*

85.    Based on the above examples of how the Tracking Tools operate on Midi's Website, the third-party technology companies would know (1) that a particular individual—who the technology companies could identify based on their respective accounts—was a patient or prospective patient of Midi, seeking women's health services; (2) that the named patient searched for information regarding symptoms, treatments, diagnosis, and medications, all related to specific conditions related to women's health; and (3) that the named patient attempted to book an appointment and/or register an account with Midi. The third-party technology companies would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

86.    Using this Personal Information, the technology companies could put the named patient into a Core or Custom Audience for purposes of targeted advertising by Midi or any other company seeking to advertise its services or products to individuals that fit the named patient's profile.  Indeed,

CLASS ACTION COMPLAINT

after using Midi's Website to communicate about private women's health treatment for themselves, Plaintiff N.C. received ads from Midi on Facebook, Instagram, and Google, and Y.H. also received ads related to women's health.

87.    Examples of recent ads Midi health has used to target individuals on Facebook and Google are reflected in Figures 7 and 8 below:



*Figure 7: Facebook Ads from Midi*



***Figure 8: Google Ads from Midi***

88.     In this way, Midi, Meta, TikTok, Google, and other third parties profit off Plaintiffs' and Class Members' Personal Information without their express prior consent or authorization.

89.     Defendant deprived Plaintiffs and the Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed in real-time Plaintiffs' and other online patients' and prospective patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to unauthorized third parties; (c) linked particular patients—Plaintiffs and the Classes—with their healthcare provider—Midi —including by revealing Plaintiffs' navigation to and use of Midi's account portal; and (c) failed to provide notice to or obtain express prior consent from Plaintiffs and the Class Members to share their Personal Information with others.

90.     Midi knew that deploying the Tracking Tools would trigger the interception of its users' substantive website communications—including pageviews, URLs, buttons clicked, and account creation—because the Tracking Tools were designed to intercept that type of information by default. Further, Midi acted with the purpose of aiding the third-party tech companies to intercept users' communications because it deployed the Tracking Tools with the goal of tracking its users' online

activities, disclosing those activities to the tech companies, and retargeting those users with advertising through the tech platforms.

**E.    Plaintiffs' and the Classes' Sensitive Information is Valuable**

91.    As many health care data industry experts have recognized, "[p]atients' medical data constitutes a cornerstone of the big data economy. A multi-billion dollar industry operates by collecting, merging, analyzing[,] and packaging patient data and selling it to the highest bidder."[28]

92.    Thus, the personal, health, and financial information of Plaintiffs and the Class Members is valuable and has become a highly desirable commodity. Indeed, one of the world's most valuable resources is the exchange of personal data.[29]

93.    Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[30] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[31]

94.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who

---

[28] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/ (last visited March 25, 2025).

[29] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited March 25, 2025).

[30] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html (last visited March 25, 2025).

[31] *Id.*

CLASS ACTION COMPLAINT

"leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[32]

95.     In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[33] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[34]

96.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[35]

97.     Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[36]

98.     Consumers place considerable value on their Personal Information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection

---

[32] Brad Brown, et al. *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (last visited March 25, 2025).

[33] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220, OECD PUBLISHING PARIS (Apr. 2, 2013), https://www.oecd.org/en/publications/exploring-the-economics-of-personal-data_5k486qtxldmq-en.html (last visited March 25, 2025).

[34] *Id.* at 25.

[35] *Id.*

[36] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited March 25, 2025).

against improper access to their Personal Information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against errors, improper access, and secondary use of personal information is worth between US$30.49 and $44.62.[37] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

99.  Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[38]

100.  Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[39]

101.  Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.  "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[40]

102.  There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our

---

[37] Il-Horn Hann, Kai-Lung Hui *et al.*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17, Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited March 25, 2025).

[38] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, https://time.com/4588104/medical-data-industry/ (last visited March 25, 2025).

[39] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 25, 2025).

[40] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited March 25, 2025).

increasingly digital economy.  Many companies, like Marriott, collect personal information.  Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

103.    Several companies have products through which they pay consumers for a license to track their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

104.    Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

105.    Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[41]

106.    Defendant's privacy violations exposed a variety of Personal Information, including patient status, health conditions and symptoms, responses to health intake questions, and other highly sensitive data.

107.    PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[42] PHI can be ten times more valuable than credit card information.[43]   This is because one's personal health history, including prior illness, surgeries,

---

[41] *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited March 25, 2025).

[42] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market. (last visited March 25, 2025).

[43] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited March 25, 2025).

diagnoses, mental health, prescriptions, and the like cannot be changed or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[44]

108.    Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[45] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[46]

**F.    Plaintiffs and Class Members Had a Reasonable Expectation of Privacy in their Interactions with Defendant's Website**

109.    Consumers assume the data they provide to healthcare providers will be kept secure and private.

110.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[47] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[48] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[49] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[50]

---

[44] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited March 25, 2025).

[45] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200 (last visited March 25, 2025).

[46] *Id.*

[47] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/ (last visited March 25, 2025).

[48] *Id.*

[49] *Id.*

[50] *Id.*

111.    Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[51]

112.    Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

## G.    Defendant's Conduct Violates HIPAA

113.    Under HIPAA, individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The [Privacy] Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[52]

114.    HIPAA "is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[53] The rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[54]

115.    HIPAA defines "protected health information" as "individually identifiable health information" that is "created or received by a health care provider" (or similar entities) that "[r]elates to past, present, or future physical or mental health or condition of an individual; the provision of health

---

[51]    Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited March 25, 2025).

[52]    U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited March 25, 2025).

[53]    *Health Insurance Portability and Accountability Act of 1996 (HIPAA)*, Centers for Disease Control and Prevention (Sept. 10, 2024), https://www.cdc.gov/phlp/php/resources/health-insurance-portability-and-accountability-act-of-1996-hipaa.html?CDC_AAref_Val=https://www.cdc.gov/phlp/publications/topic/hipaa.html (last visited March 25, 2025).

[54]    U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule.

CLASS ACTION COMPLAINT

care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Identifiers such as patient-status (i.e., information that connects a particular user to a particular health care provider), medical conditions, health symptoms, medications, and treatments, gathered in this case by the Tracking Tools through Midi's Website, constitute protected health information.

116.    When Plaintiffs communicated personal health-related information on the Midi Website, the Tracking Tools intercepted and disclosed those communications to third parties in violation of HIPAA's Privacy Rule, and Midi never received Plaintiffs' and Class Members' HIPAA-compliant consent to disclose those communications.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similar situated, as representatives of the following Classes:

Nationwide Class

All individuals residing in the United States whose Personal Information was disclosed to a third party through Defendant's Website during the applicable statute of limitations period.

California Class

All individuals residing in California whose Personal Information was disclosed to a third party through Defendant's Website during the applicable statute of limitations period.

118.    Excluded from the Classes is Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

119.    Plaintiffs reserve the right to modify and/or amend the Class definitions, as necessary.

120.    All members of the proposed Classes are readily identifiable through Defendant's records.

121.   All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

122.   **Numerosity**.  The members of the Classes are so numerous that joinder of all members of the Classes is impracticable. Plaintiffs are informed and believe that the proposed Classes include tens of thousands of people based on public reports regarding Midi's operations in numerous states across the country.[55] The precise number of the Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

123.   **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and the Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

a.   Whether Plaintiff's and Class Members' private communications were intercepted by Meta, TikTok, Google, and other third parties;

b.   Whether Midi aided, agreed with, employed or conspired with the third-party technology companies to intercept Plaintiffs' and Class Members' communications with Midi;

c.   Whether the information disclosed through the Tracking Tools constitutes content;

d.   Whether Midi obtained Plaintiffs' and Class Members' express prior consent to intercept and disclose their private health information;

e.   Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Classes' injuries;

f.   Whether Plaintiffs and the Class Members had a reasonable expectation of privacy in their Personal Information;

g.   Whether Plaintiffs and the Class Members suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

h.   Whether Plaintiffs and the Class Members are entitled to recover damages; and

---

[55] https://www.prnewswire.com/news-releases/midi-health-the-fastest-growing-virtual-clinic-for-perimenopause-and-menopause-raises-an-additional-60m-in-series-b-round--100m-total-funding-to-date--to-transform-womens-healthcare-302125839.html#:~:text=Over%20the%20past%20year%2C%20the,memory%20lapses%20within%205%20months

i.    Whether Plaintiffs and the Class Members are entitled to other appropriate remedies including injunctive relief.

124.    Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Classes. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

125.    **Typicality.**  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Personal Information, like that of every other Class Member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

126.    **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

127.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual users like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

128.    Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.  Defendant has acted or refused to act on grounds that apply generally to the Classes, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Classes remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with injuries similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual users, which would establish potentially incompatible

34

standards of conduct for Defendant, and/or (b) adjudications with respect to individual users which would, as a practical matter, be dispositive of the interests of the other users not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Classes. Further, the claims of individual users in the defined Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## LEGAL CLAIMS

### COUNT I

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code, §§ 630, *et seq.***

*(On Behalf of Plaintiffs and the Nationwide Class)*

129.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

130.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."[56] Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state."[57]

131.    CIPA imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the State of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any

---

[56] CAL. PENAL CODE § 630.

[57] *Id.*

CLASS ACTION COMPLAINT

way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be Midi  any of the acts or things mentioned above in this section."[58]

132.    Defendant is a "person" for purposes of the CIPA.

133.    Defendant maintains its principal place of business in California, where it designed, contrived, agreed, conspired, effectuated, aided, and/or received the interception and use of the contents of Plaintiffs' and Class Members' communications.

134.    Meta, TikTok, Google, and other third-party tech companies violated CIPA by willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents or meaning of any message, report, or communication while the same was in transit or passing over any wire, line, or cable, or was being sent from, or received at any place within the State of California.

135.    Defendant Midi violated CIPA by aiding, employing, agreeing with, and conspiring with Meta, TikTok, Google and other third-party tech companies to track and intercept Plaintiffs' and the Class Members' communications while using Defendant's Website.

136.    Defendant intentionally inserted an electronic device (the Tracking Tools) that, without the knowledge and consent of Plaintiffs and Class Members, recorded and transmitted their confidential communications with Defendant to third parties.

137.    The interception of Plaintiffs' and Class Members' communications and Private Information was without express prior authorization and consent from Plaintiffs and Class Members.

138.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, the tracking technology code falls under the broad catch-all category of "any other manner":

    a.    The computer codes and programs Meta, TikTok, and Google (and other third parties) used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

---

[58] *Id.* § 631.

CLASS ACTION COMPLAINT

b.  Plaintiffs' and Class Members' browsers;

c.  Defendant's Website and webserver;

d.  Plaintiffs' and Class Members' computing and mobile devices;

e.  The web and ad servers of the third-party technology companies that tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

f.  The computer codes and programs used by the third-party technology companies to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit the Website; and

g.  The plan Defendant and the third-party technology companies carried out to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to visit the Website.

139.  As a result of the above violations, Defendant is liable to Plaintiffs and Class Members for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation.[59] Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."[60]

140.  Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT II

**Invasion of Privacy in Violation of Article I, Section 1 of the California Constitution**

*(On Behalf of Plaintiffs and the California Class)*

141.  Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

---

[59] CAL. PENAL CODE § 637.2.

[60] *Id.*

142.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."[61]

143.    The right to privacy in California's Constitution creates a private right of action against private and government entities.

144.    To state a claim for invasion of privacy under the California Constitution, a Plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

145.    Plaintiffs and Class Members have an objective, reasonable expectation of privacy in their Private Information pursuant to Article I, Section 1 of the California Constitution.

146.    Plaintiffs' and Class Members' communications with Defendant constitute confidential communications.

147.    Plaintiffs and Class Members have an objective, reasonable expectation of privacy in their communications with Defendant via the Website, particularly those containing sensitive medical information.

148.    Plaintiffs and Class Members have an objective, reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiffs' or Class Members' prior authorization, consent, or knowledge.

149.    Plaintiffs and Class Members have an objective, reasonable expectation of privacy given Defendant's representations about complying with HIPAA. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

150.    Without Plaintiffs' or Class Members' prior knowledge, authorization, or consent, Defendant used the Tracking Tools embedded and concealed into the source code of its Website to

---

[61] CAL. CONST. art. I, § 1.

CLASS ACTION COMPLAINT

secretly record and transmit Plaintiffs' and Class Members' private communications to hidden third parties, such as Meta, TikTok, Google, and other third-party tracking technology companies.

151.    By intentionally embedding and implementing the Tracking Tools on its Website, Defendant invaded Plaintiffs' and Class Members' legally protected privacy interests in the confidentiality of their communications with Defendant regarding sensitive medical information.

152.    By embedding and implementing the Tracking Tools on its Website, Defendant intentionally disclosed private facts about Plaintiffs' and Class Members' symptoms, conditions, treatments, and status as patients or prospective patients to third-party tracking technology companies.

153.    Defendant's actions constituted an egregious breach of social norms and serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the Personal Information disclosed was highly sensitive and personal, as protected by the California Constitution; (ii) Defendant did not have express prior authorization or consent to disclose this information and did so in contravention of its own representations to Plaintiffs and Class Members; (iii) the invasion deprived Plaintiffs and Class Members of the ability to control the circulation of said information, which is considered a fundamental right to privacy; (iv) Plaintiffs and Class Members did not know they were being recorded and tracked; and (v) Defendant's disclosure violates HIPAA mandates, industry standards, and Defendant's own privacy policies.

154.    Defendant's invasion violated the privacy rights of thousands of Class Members, including Plaintiffs, without express prior authorization or consent. Midi's conduct constitutes a severe and egregious breach of social norms.

155.    Plaintiffs and Class Members have sustained damages and will continue to suffer damages as a direct and proximate result of Defendant's conduct, including an invasion of privacy.

156.    As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class Members' Personal Information, Plaintiff and Class Members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's Website, without providing proper consideration for Plaintiffs' and Class Members' property.

157.    Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Class Members' privacy in its use of their data for its economic value.

158.    Plaintiffs and the Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

## COUNT III

### Common Law Invasion of Privacy – Intrusion Upon Seclusion

*(On Behalf of Plaintiffs and the California Class)*

159.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

160.    A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, (2) in a manner highly offensive to a reasonable person.

161.    Plaintiffs' and Class Members' communications with Defendant via Defendant's Website constitute private communications.

162.    Plaintiffs and Class Members have an objective, reasonable expectation of privacy in their communications with Defendant via its Website, particularly those containing sensitive medical information.

163.    Plaintiffs and Class Members have an objective, reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiffs' or Class Members' express prior authorization, consent, or knowledge.

164.    Plaintiffs and Class Members have a reasonable expectation of privacy given Defendant's representations about complying with HIPAA. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

165.    By intentionally embedding and implementing the Tracking Tools on its Website, Defendant intruded upon and permitted unauthorized third parties to intrude upon Plaintiffs' and Class Members' private communications with Defendant regarding sensitive medical information.

166.    Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's intrusion of their privacy at the time it occurred. Plaintiffs and Class Members did not give express prior consent for Defendant to use Tracking Tools to actively and surreptitiously intercept their Website activities in real-time or disclose their Personal Information to its vendors and other third parties.

167.    Defendant's use of the Tracking Tools to record and disclose Plaintiffs' and Class Members' Personal Information obtained via the Website is highly offensive to a reasonable person because Plaintiffs and Class Members did not know they were being recorded and tracked, and the disclosures related to patients' and prospective patients' most sensitive personal information, including information about specific symptoms, conditions, and treatments sought. The disclosure is also highly offensive because it violates HIPAA mandates, industry standards, and Defendant's own privacy policies.

168.    By implementing the Tracking Tools on its Website, Defendant intentionally intruded on Plaintiffs' and Class Members' private life, seclusion, or solitude, without consent. This conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

169.    As a direct and proximate result of Defendant's intrusion upon Plaintiffs' and Class Members' private communications and unauthorized disclosure of Plaintiffs' and Class Members' Personal Information, Plaintiffs and Class Members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's Website, without providing proper consideration for Plaintiffs' and Class Members' property.

170.    Further, Defendant has improperly profited from its invasion of Plaintiffs' and Class Members' privacy in its use of their data for its economic value.

171.    Plaintiffs and Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

**COUNT IV**

**Breach of Confidence**

*(On behalf of Plaintiffs and the California Class)*

172.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

173.    A claim for breach of confidence requires (1) the plaintiff conveyed confidential and novel information to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a disclosure or use in violation of the understanding.

174.    Plaintiffs and the Classes conveyed confidential and novel information to Defendant in the form of personal health information concerning their symptoms and conditions related to women's health.  The confidential information was conveyed in the form of substantive communications between Plaintiffs and the Classes and Midi's Website, including filling out Midi's health assessment.

175.    Midi had knowledge that the information was being disclosed in confidence.  According to Midi's own privacy policies, Midi promised to protect personal health information consistent with HIPAA.

176.    Given Midi's assurances, regulatory guidance from the FTC and HHS regarding the use of tracking tools on healthcare websites, and the sensitive nature of the information conveyed via Midi's Website—personal health information related to an individual's health—there was an understanding between Midi and Plaintiffs and the Class Members that Midi would take reasonable steps to maintain the confidence and security of the communications.

177.    By installing the Tracking Tools on its Website that triggered the interception and disclosure of Plaintiffs' and Class Members' personal health information—which the third-party technology companies could link to particular individuals—Midi breached the confidence of Plaintiffs and the Class Members in violation of the understanding that their personal health information would be reasonably safeguarded.

178.    Midi's breach of confidence was in violation of HIPAA, regulatory guidance from the FTC and HHS, CIPA, and California common law.

42

179.    Defendant breached the confidence of Plaintiffs and the Class Members for its own financial gain and to drive revenues through increased and more effective marketing and advertising, at the expense of Plaintiffs' and the Class Members' privacy.

180.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class Members have suffered harm and injury, including the breach of their confidence and loss of control of their sensitive personal health information to some of the largest advertising technology companies in the world.

181.    Plaintiffs and Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.    Certification of the Classes pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.    Designation of Plaintiffs as representatives of the Classes and the undersigned counsel as Class Counsel;

c.    An award of damages in an amount to be determined at trial or by this Court;

d.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

e.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

f.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

g.    Awarding Plaintiffs and the Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

h.    Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

i.    Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

CLASS ACTION COMPLAINT

j.      Granting such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

**ZIMMERMAN REED LLP**

Dated: March 26, 2025          By:     */s/Ryan Ellersick*
                                       Ryan J. Ellersick (SBN 357560)
                                       Caleb Marker (SBN 269721)
                                       Jessica M. Liu (SBN 358713)
                                       6420 Wilshire Blvd., Suite 1080
                                       Los Angeles, CA 90048
                                       Tel (877) 500-8780
                                       Fax (877) 500-8781
                                       ryan.ellersick@zimmreed.com
                                       caleb.marker@zimmreed.com
                                       jessica.liu@zimmreed.com

                                       *Attorneys for Plaintiffs and the Putative Classes*